TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JOSEPH O. JOHNS (Cal. Bar No. 144524)
DENNIS MITCHELL (Cal. Bar No. 116039)
Assistant United States Attorneys
Environmental & Community Safety
Crimes Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4536
    Facsimile: (213) 894-6436
    E-mail: joseph.johns@usdoj.gov

GUSTAV W. EYLER
Director
United States Department of Justice
Consumer Protection Branch
ALLAN GORDUS
NATALIE N. SANDERS
MARYANN N. MCGUIRE
Trial Attorneys
    450 5th St NW, Suite 6400 South
    Washington, DC 20001
    Telephone: (202) 307-1862
    Facsimile: (202) 514-8742
    E-mail: allan.gordus@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>GREE USA, INC.,<br><br>        Defendant. | No. CR 2:21-CR-00498-MCS<br><br>PLEA AGREEMENT FOR DEFENDANT GREE USA, INC. |

    1.    This constitutes the plea agreement between GREE USA, INC.

("defendant") and the United States Department of Justice's Consumer

Protection Branch ("CPB") and the United States Attorney's Office for the Central District of California ("USAO" and collectively with the CPB, the "government") in the above-captioned case.  This agreement is limited to the CPB and the USAO, and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>RULE 11(c)(1)(C) AGREEMENT</u>

2.   Defendant understands that this agreement is entered under Federal Rule of Criminal Procedure 11(c)(1)(C).  Accordingly, defendant understands that, if the Court determines that it will not accept this agreement, absent a breach of this agreement by defendant prior to that determination and whether or not defendant elects to withdraw any guilty pleas entered pursuant to this agreement, this agreement will, with the exception of Paragraph 39, be rendered null and void and both defendant and the government will be relieved of their obligations under this agreement.  Defendant agrees, however, that if defendant breaches this agreement prior to the Court's determination whether or not to accept this agreement, the breach provisions of this agreement, Paragraphs 41-48 below, will control, with the result that defendant will not be able to withdraw any guilty plea entered pursuant to this agreement, the government will be relieved of all of its obligations under this agreement, the Court's failure to follow any recommendation or request regarding sentence set forth in this agreement will not provide a basis for defendant to withdraw defendant's guilty plea, and defendant will thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge.

<u>DEFENDANT'S OBLIGATIONS</u>

3.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the government and provided by the Court, appear and plead guilty to the one-count information in the form attached to this agreement as Exhibit A or a substantially similar form, charging defendant with Failure to Furnish Information Required by 15 U.S.C. § 2064(b), in violation of 15 U.S.C. §§ 2068(a)(4) and 2070.

b.   Not contest facts agreed to in this agreement.

c.   Affirmatively recommend to the Court that it impose sentence in accordance with Paragraph 33 of this agreement.

d.   Pay restitution as set forth in Paragraphs 10-19 of this agreement.

e.   Cooperate with the government as set forth in Paragraph 9 of this agreement.

f.   Fully implement the Enhanced Compliance Measures contained in Exhibit D of this agreement.

g.   Appear for all court appearances, obey all conditions of any bond, and obey any other ongoing court order in this matter.

h.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

i.   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

j.   Pay the applicable special assessment at or before the time of sentencing.

        k.   Not seek the discharge of any restitution obligation, in whole or in part, in any present or future bankruptcy proceeding.

<u>THE GOVERNMENT'S OBLIGATIONS</u>

4.   The government agrees to:

        a.   Not contest facts agreed to in this agreement.

        b.   Affirmatively recommend to the Court that it impose sentence in accordance with Paragraph 33 of this agreement.

        c.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant and/or related parent and subsidiary companies for violations arising out of the conduct described in this agreement and the agreed Statement of Facts attached to this agreement as Exhibit B (the "Covered Conduct"). Defendant understands that the government is free to prosecute defendant criminally for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement. Defendant agrees that at the time of sentencing the Court may consider uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

<u>CORPORATE AUTHORIZATION</u>

5.   Defendant represents that it is authorized to enter into this agreement.  On or before the plea hearing pursuant to this agreement, defendant shall provide the government and the Court with a legal document certifying that defendant is authorized to enter into and comply with all of the provisions of this agreement.  Such

corporate resolution shall designate a company representative for defendant who is authorized to take the actions specified in this agreement, and shall also state that all legal formalities for such authorizations have been observed in the form attached to this agreement.

ORGANIZATIONAL CHANGES AND APPLICABILITY

6.    This agreement shall bind defendant, its successor entities (if any), parent companies, and any other person or entity that assumes the liabilities contained herein ("successors-in-interest"). Defendant, or its successors-in-interest, if applicable, shall provide the government with notice in writing at least fifteen (15) days before of any name change, business reorganization, sale or purchase of assets, divestiture of assets, or similar action impacting defendant's ability to pay the fine or affecting this agreement.  No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, sale or purchase of assets, or similar action shall alter defendant's responsibilities under this agreement.  Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this agreement.

NATURE OF THE OFFENSE

7.    Defendant understands that for defendant to be guilty of the crime charged in the single-count information, that is, Failure to Furnish Information Required by 15 U.S.C. § 2064(b)(3) and (4), in violation of Title 15, United States Code, Sections 2068(a)(4) and 2070, the following must be true: defendant knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission upon obtaining information which reasonably

supported the conclusion that defendant's dehumidifiers contained a defect which created a substantial product hazard, that is, a substantial risk of injury to the public, and created an unreasonable risk of serious injury or death.

<u>PENALTIES</u>

8.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 15, United States Code, Sections 2068(a)(4) and 2070, is: a five (5) year period of probation; a fine of five hundred thousand dollars ($500,000) or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of four hundred dollars ($400).

<u>COOPERATION</u>

9.   Defendant agrees to cooperate fully with the government in any and all matters relating to the Covered Conduct until the date upon which all investigations and prosecutions arising out of the Covered Conduct are concluded.   Defendant's cooperation pursuant to this paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine.   However, defendant must provide to the government a log of any document or information that is not provided based on an assertion of law, regulation, or privilege, and defendant bears the burden of establishing the validity of any such assertions.   This cooperation shall include, but is not limited to the following:

a.   Defendant shall truthfully disclose all information not protected by a valid claim of attorney-client privilege with respect to its activities and those of any of its present and former directors, officers, employees, agents, representatives, and any

6

others concerning all matters about which the government may inquire. This obligation of truthful disclosure includes defendant's obligation to assemble, organize, and provide the government all non-privileged documents, records, or other tangible evidence in the defendant's custody or control as the government may reasonably request.

b.   Defendant shall provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or other tangible evidence in any criminal, legal, court or other proceeding as the government may request.

c.   Defendant shall, using its reasonable best efforts, make available its present and former officers, directors and employees to provide information and/or testimony as the government may request, including testimony before a grand jury, a trial court, or other legal or court proceeding, as well as interviews with law enforcement authorities.  Defendant's cooperation under this paragraph shall include identification of witnesses who have material information relating to the Covered Conduct, including identification of witnesses who have particular types of material information requested by the government.  It is further understood that defendant must at all times provide complete, truthful, and accurate information.

d.   Defendant (and its directors, officers, employees, agents, and representatives) shall testify truthfully before the grand jury and at any trial or other proceeding with respect to any matters about which they may be questioned.  Defendant (and its directors, officers, employees, agents, and representatives) shall at

all times give complete, truthful, and accurate information and testimony.  Defendant (and its directors, officers, employees, agents, and representatives) shall neither attempt to protect any person who has been involved in criminal activity, nor falsely implicate anyone in criminal activity.

RESTITUTION

10.  Defendant agrees to pay restitution under 18 U.S.C. § 3663(a)(3) to individuals who were directly and proximately harmed, either through physical injury or financial loss, by a fire or overheating caused by one of the defendant's dehumidifiers that were manufactured by co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI in 2010 through 2013, sold in the United States, and subject to the recall that co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI announced on September 12, 2013, expanded on January 30, 2014, and re-announced on November 29, 2016.  The restitution owed to such individuals shall be reduced by the amount of compensation that they have already received for their losses through earlier payments from the defendant, co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., or other sources, including but not limited to, insurance.

11.  Defendant agrees to pay restitution under 18 U.S.C. § 3663(a)(3) to entities that were directly and proximately harmed by a fire or overheating that was caused by one of the defendant's dehumidifiers that were manufactured by co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI in 2010 through 2013, sold in the United States, and subject to the recall that co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI announced on September 12, 2013, expanded on January 30, 2014, and re-announced on November 29, 2016.  The

restitution owed to such entities shall be reduced by the amount of compensation that they have already received for their losses through earlier payments from the defendant, co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., or other sources, including but not limited to, insurance.

12.   Defendant agrees that all such individuals and entities mentioned in Paragraphs 10 and 11 are victims of the crime to which it is pleading guilty or other uncharged crimes related to the crime to which it is pleading guilty.  In exchange for the government not charging additional crimes against defendant, defendant agrees to pay the restitution set forth in Paragraphs 10-19, even though the defendant will not be convicted of those additional crimes.  These additional crimes give rise to this agreement and include offenses against property under Title 18, United States Code, for which restitution may be ordered under 18 U.S.C. § 3663A(c)(1).

13.   Defendant and the government request that the Court appoint a United States Magistrate Judge or Special Master under 18 U.S.C. § 3664(d)(6) as appropriate and necessary to determine the proper payment of the restitution set forth in Paragraphs 10 and 11. Defendant and the government request that the United States Magistrate Judge or Special Master, as determined by the Court, make findings of fact regarding:

a.   Who should receive restitution under Paragraphs 10 and 11; and

b.   The restitution amounts that these individuals and entities should receive.

14.   In connection with the administration and disposition of restitution in this matter, defendant and the government request that the United States Magistrate Judge or Special Master:

a.   Notify potential claimants of the restitution claim process within one hundred twenty (120) days of the defendant's sentencing proceeding;

b.   Collect restitution claims for a period of one hundred eighty (180) days after the date of the last notice to potential claimants.  Restitution claims submitted later than one hundred eighty (180) days after the date of the last notice to potential claimants are not eligible for restitution;

c.   Determine the validity of each submitted restitution claim, and for each valid claim, determine the amount of restitution owed for that claim;

d.   Implement appropriate procedures necessary to carry out the foregoing duties within one hundred twenty (120) days of the sentencing proceeding;

e.   Promptly notify defendant, co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., and the government of all claims received; and

f.   Report to the Court every sixty (60) days following the defendant's sentencing proceeding on the status of the United States Magistrate Judge's or Special Master's work to date, anticipated future efforts, and any matters the United States Magistrate Judge or Special Master believes require the Court's attention.

15.  If the United States Magistrate Judge or Special Master decides that restitution is owed on a claim, defendant will pay that

claim within ten (10) days after the United States Magistrate's or Special Master's decision becomes final.  The United States Magistrate Judge's or Special Master's decision becomes final forty-five (45) days after the first notice of the decision to defendant, co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, or co-defendant HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD.

a.   Defendant will pay any restitution award of fifty thousand dollars ($50,000) or less within ten days after the United States Magistrate Judge's or Special Master's decision becomes final. Defendant has no right to appeal any decision awarding restitution of fifty thousand dollars ($50,000) or less.

b.   Defendant may appeal in a court of competent jurisdiction any decision awarding restitution greater than fifty thousand dollars ($50,000).  If defendant appeals or challenges the United States Magistrate Judge's or Special Master's decision within forty-four (44) days after the first notice of the decision to defendant, co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, or co-defendant HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., the United States Magistrate Judge's or Special Master's decision does not become final until all of defendant's appeals have been exhausted.

c.   All decisions by the United States Magistrate Judge or Special Master will be vested in their discretion and, if contested, will be reviewed under the arbitrary-and-capricious standard set forth in 5 U.S.C. § 706(2)(A).  Review of any decision by the United States Magistrate Judge or Special Master will be based exclusively on the written record before the United States Magistrate Judge or Special Master at the time of the decision.  No discovery will be

taken in a challenge to the United States Magistrate Judge's or Special Master's decision.

16.  Defendant will have a reasonable opportunity to investigate and challenge any claim before the United States Magistrate Judge or Special Master makes a decision.  Defendant's reasonable opportunity to investigate and challenge a claim will not exceed six (6) months from the first notification to defendant, co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, or co-defendant HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD. of the claim, unless the United States Magistrate Judge or Special Master decides to extend the time for defendant to investigate and challenge a claim.  In no event will defendant's opportunity to investigate and challenge a claim exceed twelve (12) months after the first notification to defendant, co-defendant GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, or co-defendant HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD. of the claim.

17.  The United States Magistrate Judge or Special Master may request from the Court a reasonable extension of the time periods in the preceding paragraphs as circumstances warrant.

18.  Defendant shall promptly provide to the United States Magistrate Judge or Special Master all documentary materials or testimonial information reasonably requested by the United States Magistrate Judge or Special Master, subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine.  However, defendant must provide to the government a log of any document or information that is not provided based on an assertion of law, regulation, or privilege, and defendant bears the burden of establishing the validity of any such assertions.

19.   Defendant shall pay in full any costs, fees, and expenses the United States Magistrate Judge or Special Master incurs in carrying out his or her duties separate and apart from any restitution paid to victims with valid restitution claims.

## SUSPENSION, REVOCATION, AND DEBARMENT

20.   Defendant understands that if defendant holds any regulatory licenses or permits, the conviction in this case may result in the suspension or revocation of those licenses and permits. The government makes no representation or promise concerning suspension or debarment of defendant from contracting with the United States or with any office, agency, or department thereof.   Suspension and debarment of organizations convicted under various federal criminal statutes is a discretionary administrative action solely within the authority of the federal contracting agencies.   Defendant understands that unanticipated collateral consequences such as this will not serve as grounds to withdraw defendant's guilty plea.

## FACTUAL BASIS

21.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.   Defendant further admits that it is responsible for the acts of its employees, directors, officers, and agents, as set forth in the Statement of Facts attached hereto as Exhibit B and incorporated by reference herein.   Defendant and the government agree to the Statement of Facts, and agree that this Statement of Facts is sufficient to support a plea of guilty for defendant to the charge described in this agreement, and to establish the Sentencing Guidelines factors set forth in Paragraphs 30 and 31 below as well as the fine, and restitution payments specified in this agreement.   Defendant and the

government also agree that the Statement of Facts is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

COMPLIANCE PROGRAM

22.   Defendant further agrees to comply with the terms of the Enhanced Compliance Measures as set forth in Exhibit D to this agreement and incorporated by reference herein, and to institute and maintain, at a minimum, the policies and procedures as described therein, which are intended to prevent future violations of law, including the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* ("CPSA"), and its implementing regulations.

PUBLICATION

23.   Within ten (10) days of the filing of this agreement, defendant agrees to make the information, this agreement, and the Statement of Facts conspicuously available to the public on the Gree website (https://global.gree.com/usa/) for two (2) years after the filing of this agreement.

NOTICE

24.   Notice shall be effective upon actual receipt by the government or the defendant.

25.   Any notice to the defendant under this agreement shall be given by: (1) email to an email address provided by the defendant; and (2) personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

James M. Koukios
Sophia H. Cash
Morrison & Foerster LLP
2100 L Street, NW, Suite 900
Washington, DC 20037

14

26.   Any notice to the government under this agreement shall be given by: (1) email to an email address provided by the government; and (2) personal delivery, or overnight delivery by a recognized delivery service addressed to the following:

Director, Consumer Protection Branch
U.S. Department of Justice
450 5th St NW, Suite 6400 South
Washington, DC 20001

and

Chief, Environmental & Community
Safety Crimes Section
U.S. Attorney's Office
Central District of California
1300 United States Courthouse
312 North Spring Street
Los Angeles, California 90012

SENTENCING FACTORS AND AGREED-UPON SENTENCE

27.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only.

28.   Defendant and the government agree that the 2018 United States Sentencing Guidelines are applicable to the defendant's sentencing.

29.   Defendant and the government stipulate and agree that U.S.S.G. § 2B1.1 applies to the defendant's sentencing pursuant to U.S.S.G. § 2N2.1(c)(1).

30.   Defendant and the government stipulate and agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| <u>Base Offense Level</u>: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |

<u>Specific Offense Characteristics</u>:

| | | |
|---|---|---|
| Loss of More Than $9,500,000 | +20 | [U.S.S.G. § 2B1.1(b)(1)(K)] |
| Resulted in Substantial Financial Hardship to Five or More Victims | +4 | [U.S.S.G. § 2B1.1(b)(2)(B)] |
| Substantial Part of Scheme Committed Outside the United States/Involved Sophisticated Means | +2 | [U.S.S.G. § 2B1.1(b)(10)] |
| Involved Conscious or Reckless Risk of Death or Serious Bodily Injury | +2 | [U.S.S.G. § 2B1.1(b)(16)(A)] |
| <u>Total Offense Level</u>: | 34 | |

31.   Defendant and the government further stipulate and agree to the following applicable Sentencing Guidelines factors:

a.   The defendant's base fine pursuant to U.S.S.G. § 8C2.4(e) is twenty-eight million, five hundred thousand dollars ($28,500,000), the amount from the offense level fine table based on the defendant's offense level.

b.   Defendant's culpability score pursuant to U.S.S.G. § 8C2.5 is five (5), calculated as follows:

i.   U.S.S.G. § 8C2.5(a) – Base Culpability Score: five (5).

ii.   U.S.S.G. § 8C2.5(b)(4) – the organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense: plus two (+2).

iii. U.S.S.G. § 8C2.5(g)(2) – the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct: minus two (-2).

c.   Defendant's fine multiplier range with a culpability score of five (5) pursuant to U.S.S.G. § 8C2.6 is one (1) to two (2).

d.   Defendant's fine range pursuant to U.S.S.G. § 8C2.7 is twenty-eight million, five hundred thousand dollars ($28,500,000) to fifty-seven million dollars ($57,000,000).

32.   Defendant and the government agree not to argue that any other specific offense characteristics, adjustments, or departures be imposed.

33.   Defendant and the government stipulate and agree that, taking into account the factors listed in 18 U.S.C. § 3553(a), defendant shall be sentenced as follows:

a.   <u>Criminal Fine</u>: Pursuant to Paragraph 28 of the Deferred Prosecution Agreement with co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI and HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI and HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD. have agreed to pay a criminal penalty of fifty-two million two hundred thousand dollars ($52,200,000) to the United States relating to the same underlying conduct of defendant described herein.  Defendant is the United States subsidiary of co-defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI and HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD.  In conjunction with co-defendants' deferred prosecution agreement and pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the government and defendant agree that

defendant shall pay a total criminal fine in the amount of five hundred thousand dollars ($500,000) as to the count of conviction. The criminal fine shall be paid within ten (10) business days of the entry of judgment by wire transfer to the Clerk of the United States District Court for the Central District of California, and confirmation of the completed wire transfer shall be provided to the government.

b. <u>Special Assessment</u>: Defendant shall pay a mandatory special assessment in the amount of four hundred dollars ($400).

c. <u>Restitution</u>: Defendant shall be ordered to pay restitution as set forth in Paragraphs 10-19 above.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

34. Defendant understands that by pleading guilty, defendant gives up the following rights:

a. The right to persist in a plea of not guilty.

b. The right to a speedy and public trial by jury.

c. The right to be represented by counsel at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel at all other proceedings.

d. The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e. The right to confront and cross-examine witnesses against defendant.

f. The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF STATUTE OF LIMITATIONS</u>

35.  Having been fully advised by defendant's attorneys regarding application of the statute of limitations to the offense to which defendant is pleading guilty, defendant hereby knowingly, voluntarily, and intelligently waives, relinquishes, and gives up:

a.    any right that defendant might have not to be prosecuted for the offense to which defendant is pleading guilty because of the expiration of the statute of limitations for the offense prior to the filing of the information alleging the offense; and

b.    any defense, claim, or argument defendant could raise or assert that prosecution of the offense to which defendant is pleading guilty is barred by the expiration of the applicable statute of limitations, pre-indictment delay, or any speedy trial violation.

<u>WAIVER OF APPEAL OF CONVICTION</u>

36.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal its conviction on the offense to which defendant is pleading guilty.

1

## LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

2      37.   Defendant agrees that, provided the Court imposes the

3  sentence specified in Paragraph 33 above, defendant gives up the

4  right to appeal any portion of that sentence.

5      38.   The government agrees that, provided the Court imposes the

6  sentence specified in Paragraph 33 above, the government gives up its

7  right to appeal any portion of that sentence.

8

## RESULT OF WITHDRAWAL OF GUILTY PLEA

9      39.   Defendant agrees that if, after entering a guilty plea

10  pursuant to this agreement, defendant seeks to withdraw and succeeds

11  in withdrawing the defendant's guilty plea on any basis other than a

12  claim and finding that entry into this plea agreement was

13  involuntary, then:

14         a.   the government will be relieved of all of its

15  obligations under this agreement; and

16         b.   should the government choose to pursue any charge or

17  any civil, administrative, or regulatory action that was either

18  dismissed or not filed as a result of this agreement, then:

19              i.   any applicable statute of limitations will be

20  tolled between October 25, 2017, and the filing or commencing of any

21  such action;

22              ii.  defendant waives and gives up all defenses based

23  on the statute of limitations, any claim of pre-indictment delay, or

24  any speedy trial claim with respect to any such action, except to the

25  extent that such defenses existed as of October 25, 2017; and

26              iii. defendant waives the rights enumerated in Federal

27  Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410

28  with respect to the Statement of Facts in Exhibit B to this agreement

making the Statement of Facts admissible against it for any purpose in any federal criminal, civil, administrative or regulatory proceeding so long as the government has fulfilled all of its obligations in this agreement and the Court has imposed the agreed-upon sentence before defendant withdraws its guilty plea.  Defendant acknowledges that Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  Defendant expressly warrants that it understands these rules and makes this waiver after having discussed these rules with its counsel.

## EFFECTIVE DATE OF AGREEMENT

40.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and a CPB Trial Attorney and an Assistant United States Attorney.

## BREACH OF AGREEMENT

41.  Defendant breaches this agreement if defendant, at any time after the Effective Date of this Agreement:

a.  commits any felony under United States law;

b.  provides in connection with this agreement deliberately false, incomplete, or misleading information;

c.  fails to cooperate as set forth in Paragraph 9 of this agreement;

d.  fails to implement fully the Enhanced Compliance Measures as set forth in Exhibit D of this agreement; or

e.    otherwise fails to perform or to fulfill completely each of defendant's obligations under this agreement, including the obligation to pay restitution as set forth in Paragraphs 10-19.

42.   Defendant's breach of this agreement shall result in the following:

a.    defendant will not be able to withdraw its guilty plea if defendant has previously entered a guilty plea pursuant to this agreement;

b.    the government will be relieved of all of its obligations under this agreement;

c.    the Court's failure to follow any recommendation or request regarding defendant's sentence set forth in this agreement will not provide a basis for defendant to withdraw defendant's guilty plea; and

d.    defendant will thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including, but not limited to, federal criminal violations relating to the conduct set forth in the Statement of Facts in Exhibit B of this agreement, which may be pursued by the government in the United States District Court for the Central District of California or any other appropriate venue.

43.   Determination of whether defendant has breached this agreement shall be in the government's sole discretion. Determination of whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, defendant, will be imputed to defendant for the purpose of determining whether defendant has breached this agreement shall be in the government's sole discretion.

44.   If the government receives evidence that defendant has breached this agreement, the government agrees to give defendant written notice of any alleged breach before making a determination of whether defendant has breached this agreement.  Within forty-five (45) days of receipt of such notice, defendant shall have the opportunity to respond to the government in writing to explain the nature and circumstances of such alleged breach, as well as the actions defendant has taken to address and remediate the situation. The government shall consider defendant's written explanation before making a determination of whether defendant has breached this agreement.

45.   Determination of whether to pursue prosecution of defendant after breach of this agreement pursuant to Paragraph 42.d shall be in the government's sole discretion.  The government shall consider defendant's written explanation of its breach provided for in Paragraph 44 before determining whether to pursue prosecution of defendant.

46.   Any prosecution of defendant pursuant to Paragraph 42.d may be premised on information provided by defendant.  Any such prosecution relating to the conduct described in the Statement of Facts in Exhibit B of this agreement or relating to conduct known to the government before October 25, 2017, that was not time-barred by the applicable statute of limitations on October 25, 2017, may be commenced against defendant, notwithstanding the expiration of the statute of limitations, between October 25, 2017, and the government's written notice of alleged breach plus one (1) year. Thus, by signing this agreement, defendant agrees that the statute of limitations with respect to any prosecution pursuant to

23

Paragraph 42.d that was not time-barred on October 25, 2017, shall be tolled until one (1) year after any government written notice of alleged breach of this agreement.  Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any prosecution pursuant to Paragraph 42.d, except to the extent that such defenses existed on October 25, 2017.

47.  In the event that the government determines that defendant has breached this agreement:

a.  all statements made by or on behalf of defendant to the government or to the Court, including the Statement of Facts in Exhibit B of this agreement, and any testimony given by defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether before or after this agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the government against defendant; and

b.  defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of defendant before or after this agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.

48.  Defendant acknowledges that the government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if defendant breaches this agreement and this matter proceeds to judgment.  Defendant further acknowledges that any

such sentence is solely within the discretion of the Court and that nothing in this agreement binds or restricts the Court in the exercise of its discretion.

COURT AND PROBATION OFFICE NOT PARTIES

49.   Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the government's sentencing recommendations or the parties' agreements to facts, sentencing factors, or sentencing. Defendant understands that the Court will determine the facts, sentencing factors, and other considerations relevant to sentencing and will decide for itself whether to accept and agree to be bound by this agreement.

50.   Defendant understands that both defendant and the government are free to:

a.   supplement the facts by supplying relevant information to the United States Probation Office and the Court;

b.   correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence; and

c.   argue on any appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the conclusions, calculations and sentence referenced in Paragraphs 28-31 and 33 are consistent with the facts of this case.

While this paragraph permits both the government and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may

1  be viewed as inconsistent with the facts agreed to in this agreement,

2  this paragraph does not affect defendant's and the government's

3  obligations not to contest the facts agreed to in this agreement.

### NO ADDITIONAL AGREEMENTS

5       51.  Defendant understands that, except as set forth herein,

6  there are no promises, understandings, or agreements between the

7  government and defendant or defendant's attorneys, and that no

8  additional promise, understanding, or agreement may be entered into

9  unless in a writing signed by all parties or on the record in court.

### PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

11      52.  The parties agree that this agreement will be considered

12 part of the record of defendant's guilty plea hearing as if the

13 entire agreement had been read into the record of the proceedings.

AGREED AND ACCEPTED

**UNITED STATES ATTORNEY'S OFFICE**
**FOR THE CENTRAL DISTRICT OF**
**CALIFORNIA**

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

*Joseph O. Johns* *by AAG*
JOSEPH O. JOHNS
DENNIS MITCHELL
Assistant United States Attorneys

_10/26/21_
Date

**UNITED STATES DEPARTMENT OF**
**JUSTICE**
**CONSUMER PROTECTION BRANCH**

GUSTAV W. EYLER
Director
Consumer Protection Branch

*Allan Gordus*
ALLAN GORDUS
NATALIE N. SANDERS
MARYANN N. MCGUIRE
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice

_10/26/21_
Date

26

DEFENDANT GREE USA, INC.

NAME:  Jun Ouyang
TITLE: Chief Executive
Officer,Chief Financial
Officer,and Director
Authorized Representative of
Defendant GREE USA, INC.

2021.10.20
Date


MORRISON & FOERSTER LLP
JAMES M. KOUKIOS
SOPHIA H. CASH
On Behalf of Defendant
GREE USA, INC.

10/21/2021
Date

27

1                    CERTIFICATION OF DEFENDANT

2        I have been authorized by defendant GREE USA, INC. ("defendant")

3   to enter into this agreement on behalf of defendant.  I have read

4   this agreement in its entirety.  This agreement has been read to me

5   in Mandarin, the language which I understand best.  I have had enough

6   time to review and consider this agreement, and I have carefully and

7   thoroughly discussed every part of it with defendant's attorney.  I

8   understand the terms of this agreement, and I voluntarily agree to

9   those terms on behalf of defendant.  I have discussed the evidence

10  with defendant's attorney, and defendant's attorney has advised me of

11  defendant's rights, of possible pretrial motions that might be filed,

12  of possible defenses that might be asserted either prior to or at

13  trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of

14  relevant Sentencing Guidelines provisions, and of the consequences of

15  entering into this agreement.  No promises, inducements, or

16  representations of any kind have been made to me or to defendant

17  other than those contained in this agreement.  No one has threatened

18  or forced me or defendant in any way to enter into this agreement.  I

19  am satisfied with the representation of defendant's attorney in this

20  matter, and I am pleading guilty on behalf of defendant because

21  defendant is guilty of the charge and wishes to take advantage of the

22  promises set forth in this agreement, and not for any other reason.

23                                              2021.10.20
    _____        _____
24  NAME: Jun Ouyang                        Date
    TITLE: Chief Executive
25  Officer, Chief Financial
    Officer, and Director
26  Authorized Representative of
    Defendant GREE USA, INC.

27

28

                                28

1

CERTIFICATION OF INTERPRETER

2     I, [Ling Liu], am fluent in the written and spoken English and

3  Mandarin languages.  I accurately translated this entire agreement

4  from English into Mandarin to defendant GREE USA, INC. on this date.

5

6

7  _Ling Liu_____      _2021.10.12_____

    INTERPRETER               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      <u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

2          I am defendant GREE USA, INC.'s attorney.  I have carefully and

3      thoroughly discussed every part of this agreement with the authorized

4      representative of my client.  Further, I have fully advised my client

5      of its rights, of possible pretrial motions that might be filed, of

6      possible defenses that might be asserted either prior to or at trial,

7      of the sentencing factors set forth in 18 U.S.C. § 3553(a), of

8      relevant Sentencing Guidelines provisions, and of the consequences of

9      entering into this agreement.  To my knowledge: no promises,

10     inducements, or representations of any kind have been made to my

11     client other than those contained in this agreement; no one has

12     threatened or forced my client in any way to enter into this

13     agreement; my client's decision to enter into this agreement is an

14     informed and voluntary one; and the factual basis set forth in this

15     agreement is sufficient to support my client's entry of a guilty plea

16     pursuant to this agreement.

17

18     _____              10/21/2021
       MORRISON & FOERSTER LLP                  Date
19     JAMES M. KOUKIOS
       SOPHIA H. CASH
       On Behalf of Defendant
20     GREE USA, INC.

21

22

23

24

25

26

27

28

## CERTIFICATE OF CORPORATE RESOLUTIONS FOR GREE USA

WHEREAS, Gree USA, Inc. ("Gree USA") has been engaged in discussions with the United States Department of Justice's Consumer Protection Branch ("CPB") and the United States Attorney's Office for the Central District of California (the "USAO") regarding issues relating to a knowing and willful failure to report information regarding consumer product safety defects, hazards, and risks to the United States Consumer Product Safety Commission (the "CPSC");

WHEREAS, in order to resolve such discussions, it is proposed that Gree USA agrees to the terms and obligations of a plea agreement among Gree USA, CPB, and the USAO (the "Plea Agreement");

WHEREAS, the Chief Executive Officer, Chief Financial Officer, and Director of Gree USA:

- has been extensively briefed on discussions with CPB and USAO regarding an agreement to resolve this matter;

- was informed of the principal terms of the Plea Agreement by Gree USA's inside counsel, together with outside counsel for Gree USA, and agrees that Gree USA should enter into an agreement on those terms;

- has been provided with the Plea Agreement and its attachments for review;

- has reviewed documents relevant to the Plea Agreement and has discussed the final terms of the Plea Agreement with Gree USA's inside counsel, together with outside counsel for Gree USA, who have advised the Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, of Gree USA's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of agreeing to such terms and obligations of the Plea Agreement;

9

Therefore, on behalf of Gree USA, the Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, Jun Ouyang, has APPROVED the following:

1.   Gree USA: (a) acknowledges the filing of the Information against Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Hong Kong Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong"), and Gree USA, charging each company with one count of failure to furnish information required by Title 15, United States Code Section 2064(b)(3) and (4), in violation of Title 15, United States Code, Section 2068(a)(4) and 2070; (b) waives indictment on such charge and agrees to the obligations under the Plea Agreement; (c) agrees that Gree Zhuhai or Gree Hong Kong will pay a total criminal fine of $500,000 on behalf of Gree USA; (d) agrees to pay a special assessment of $400; and (e) agrees to accept the restitution provisions of the Plea Agreement;

2.   Gree USA accepts the terms and conditions of the Plea Agreement, including but not limited to: (a) a knowing waiver of Gree USA's rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and the Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Plea Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Plea Agreement of any objection with respect to venue and consents to the filing of the Information against Gree USA, as provided under the terms of the Plea Agreement, in the United States District Court for the Central District of California; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution arising out of the conduct described in the Statement of Facts attached to the Plea Agreement;

3.   The Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, Jun Ouyang, is hereby authorized, empowered, and directed, on behalf of Gree USA, to agree to the terms and obligations of the Plea Agreement with such changes as Jun Ouyang may approve;

10

4.   The Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, Jung Ouyang, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions;

5.   All of the actions of the Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, Jun Ouyang, which would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of Gree USA and its subsidiaries and affiliates; and

6.   The Chief Executive Officer, Chief Financial Officer, and Director of Gree USA, Jun Ouyang, and Jian Chen are hereby authorized, empowered, and directed to appear on behalf of Gree USA at any court appearances in connection with the Plea Agreement.

Date:   2021.10.20                           By: _____

1                       **EXHIBIT A**

8                UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>GREE ELECTRIC APPLIANCES, INC.<br>   OF ZHUHAI,<br>HONG KONG GREE ELECTRIC<br>   APPLIANCES SALES CO., LTD.,<br>   and<br>GREE USA, INC.,<br><br>        Defendants. | CR No.<br><br>I N F O R M A T I O N<br><br>[15 U.S.C. §§ 2068(a)(4), 2070:<br>Knowing and Willful Failure to<br>Report Information Regarding<br>Consumer Product Safety Defects,<br>Hazards, and Risks; 15 U.S.C.<br>§ 2070(c)(1), 18 U.S.C.<br>§ 981(a)(1)(C), 21 U.S.C. § 853,<br>28 U.S.C. § 2461(c): Criminal<br>Forfeiture] |

19     The United States Department of Justice's Consumer Protection

20 Branch and the Acting United States Attorney for the Central District

21 of California charge:

22               [15 U.S.C. §§ 2068(a)(4), 2070]

23                 [ALL DEFENDANTS]

24 A.   INTRODUCTORY ALLEGATIONS

25     1.  By at least September 2012, in Los Angeles County, within

26 the Central District of California, and elsewhere, defendants GREE

27 ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC

28 APPLIANCES SALES CO., LTD., and GREE USA, INC., obtained information

which reasonably supported the conclusion that dehumidifiers manufactured, distributed, and sold in interstate commerce by the defendants contained a defect that caused those dehumidifiers to overheat and catch fire, creating a substantial product hazard, and created an unreasonable risk of serious injury and death to United States consumers who operated the dehumidifiers in their homes and businesses.

2.   Despite knowing that they were required immediately to inform the United States Consumer Product Safety Commission of the defects and risks of those dehumidifiers they manufactured, distributed, and sold in interstate commerce, defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., and GREE USA, INC., knowingly and willfully failed to inform the United States Consumer Product Safety Commission of those dehumidifiers' defects and risks until in or about June 2013.

B.   <u>KNOWING AND WILLFUL FAILURE TO REPORT INFORMATION REGARDING CONSUMER PRODUCT SAFETY DEFECTS, HAZARDS, AND RISKS</u>

3.   From on or about September 19, 2012, through at least on or about June 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., and GREE USA, INC., knowingly and willfully failed to immediately report to the United States Consumer Product Safety Commission upon receiving information that reasonably supported the conclusion that the Chinese dehumidifiers contained a defect that could create a substantial product hazard, and created an unreasonable risk of

serious injury and death, as required by Title 15, United States Code, Section 2064(b)(3) and (4).

FORFEITURE ALLEGATIONS

[15 U.S.C. § 2070(c)(1); 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853;

28 U.S.C. § 2461(c)]

4.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 15, United States Code, Section 2070(c)(1) and Title 28, United States Code, Section 2461(c) in the event of any defendant's conviction under the sole count of this Information:

5.   Defendants shall forfeit the following property to the United States of America:

   a.   all right, title, and interest in any and all property associated with any violation of the sole count of this Information; and

   b.   to the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subsection a.

7.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of

//
//
//
//
//
//
//

4

1   any act or omission of a defendant, the property described in the

2   preceding paragraph, or any portion thereof: (a) cannot be located

3   upon the exercise of due diligence; (b) has been transferred or sold

4   to, or deposited with a third party; (c) has been placed beyond the

5   jurisdiction of the court; (d) has been substantially diminished in

6   value; or (e) has been commingled with other property that cannot be

7   divided without difficulty.

8   TRACY L. WILKISON                   GUSTAV W. EYLER
    Acting United States Attorney       Director
9                                       Consumer Protection Branch

10

11
    SCOTT M. GARRINGER                  ALLAN GORDUS
12  Assistant United States Attorney    NATALIE N. SANDERS
    Chief, Criminal Division            MARYANN N. MCGUIRE
13                                      Trial Attorneys
    JOSEPH O. JOHNS                     Consumer Protection Branch
14  DENNIS MITCHELL                     Civil Division
    Assistant United States Attorneys   U.S. Department of Justice
15  Environmental & Community Safety
      Crimes Section
16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

**Statement of Facts**

Defendants Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Gree USA, Inc. ("Gree USA"), and Hong Kong Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong") (collectively the "Gree Companies") hereby agree and stipulate that the following information is true and accurate.  The Gree Companies admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below.  The Gree Companies also admit, accept, and acknowledge that, had this matter proceeded to trial, the government would have proven beyond a reasonable doubt, by admissible evidence, the facts set forth below.

The Gree Companies

1.   From 2007 to September 2013, Gree Zhuhai was a large Chinese company that manufactured household appliances ("Gree appliances") for sale in and outside of China, including in the United States.

2.   From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree Zhuhai that exported Gree appliances to the United States.

3.   From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong.  Gree USA sold Gree appliances to retailers in the United States.  Those Gree appliances were manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong and Gree USA.  Gree USA was a joint venture between Gree Hong Kong and another company, MJC America Holdings Co., Inc. ("MJC America Holdings").  Gree Hong Kong was the majority owner of

1

Gree USA.  Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO, and Chief Administrative Officer ("CAO") were owners of MJC America Holdings.  Gree USA's CEO, CFO and CAO effectively controlled Gree USA.

4.  From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong ("Gree dehumidifiers").

The Consumer Product Safety Commission and

the Consumer Product Safety Act

5.  The Consumer Product Safety Act (the "CPSA") was enacted to protect the public from dangerous consumer products.

6.  The United States Consumer Product Safety Commission (the "CPSC") is the federal agency responsible for protecting consumers from dangerous consumer products and is the lead federal agency responsible for the implementation, enforcement, and administration of the CPSA.  The CPSC can order mandatory recalls of dangerous products.

7.  The CPSA requires companies that manufacture, import, distribute, or sell consumer products to inform the CPSC, among other things, about any consumer product about which information reasonably supports the conclusion that such product contains a defect that could create a substantial product hazard, or creates an unreasonable risk of serious injury or death.  This duty to report also applies to the individual directors, officers, and agents of those companies.  A company's or an individual's knowing and willful failure to report an unsafe product to the CPSC is punishable as a felony violation of the CPSA.

## The Gree Companies Learn that Their Dehumidifiers

## Are Catching Fire

8.   On or about July 26, 2012, the CEO of Gree USA saw a video of a burning Gree dehumidifier.  On July 26, 2012, Gree USA's CEO sent the video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"), who was also a director of Gree Hong Kong and in charge of exporting Gree appliances for sale in the United States, copying other Gree USA employees and a Gree Zhuhai employee.  In sending the video, Gree USA's CEO labeled the email "urgent," and said that the video was "scarey [sic] to just watch" and a "very serious issue with GREE product quality."  Gree USA's CEO also stated that the video was the third reported instance of a Gree appliance catching fire since in or about June 2012 and that it could lead to lawsuits against Gree USA as well as a recall costing millions of dollars. Gree USA's CEO knew that the Gree Companies had an obligation to inform the CPSC immediately of any consumer product that contained a defect creating a substantial product hazard or that created an unreasonable risk of serious injury or death.

9. Gree Hong Kong Manager #1, replied to the July 26, 2012 email from Gree USA's CEO that same day.  In his reply email, Gree Hong Kong Manager #1 said that "[w]e also felt shock when we watched the video[,]" and that he had sent the video to Gree Zhuhai's Quality Department and to Gree Zhuhai's chief engineer who was also its senior vice president for research and development.

## The Gree Companies Learn that Two Defects in

## Their Dehumidifiers are Causing Them to Catch Fire

10. During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for

potential defects that could cause them to catch fire.  No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012.

11. On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers.  The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these dehumidifiers burned.  The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch the fire and apparently the material is not according to UL standard! I don't think the factory is telling us the fact and truth. . . ."  The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers.

12.  On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any expense and responsibility."  That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects.  Gree Hong Kong Manager #1 replied on September 6, 2012, stating that they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical

4

information if you need any."  After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects.

13. On September 10, 2012, Gree USA's CEO emailed the highest ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong Kong.  In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC.  Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance.  Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC information about a dangerous product could face severe punishment, including criminal prosecution.  Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers.  Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers.  No one replied to this email.

14. On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1.  In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook."  Gree USA's CEO also

discussed the financial costs and lost sales that could result from a recall.  He did not express any consideration or concern about how defective Gree dehumidifiers could harm consumers.  Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhai's chief engineer.

15. On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO.  A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting.  This meeting was audio recorded by agreement.

16. At this September 19 meeting, Gree Hong Kong Manager #1 stated that Gree Zhuhai's testing of the Gree dehumidifiers was not able to reproduce the reported fire, but had revealed two defects: (1) the dehumidifiers used plastics that did not meet UL standards for fire resistance; and (2) electrical arcing caused by the dehumidifiers' compressors overheating could burn the non-UL standard plastic used in these dehumidifiers.  The Gree Zhuhai engineer at the meeting also discussed these defects.  Gree Hong Kong Manager #1 stated that he was aware of at least five consumer reports of Gree dehumidifiers overheating and catching fire but that Gree Zhuhai "still believe[d] that the fire case is a relatively isolated case . . . associated with atrocious conditions."  He also stated that Gree Zhuhai would modify the manufacture of all future dehumidifiers to fix this problem so they would not catch fire.

<u>The Gree Companies Decide To Delay Reporting and Recalling</u>

<u>Their Defective Dehumidifiers</u>

17. At this same September 19 meeting, Gree Hong Kong Manager #1 said that the meeting participants' decisions on what to do about

the Gree dehumidifiers should be guided by the principle of minimizing the costs and loss of reputation to the Gree Companies. Gree Hong Kong Manager #1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers for 6 to 9 months because delaying a recall would reduce the recall's effect on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that an immediate recall would have a significant, and negative, effect on 2012 and 2013 Gree dehumidifier sales.  Gree Hong Kong Manager #1 stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012.

18.  In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications.  But the Gree USA CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall.  Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because that test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed.

19.  Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson.  In his September 21, 2012

7

email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months.  Gree USA's CEO also said that he thought that the Gree dehumidifiers were still likely to catch fire, and that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government.

20. The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson.  In his September 22, 2012 email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion.  Gree Zhuhai's chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhai's board chairperson and listen to her opinion.

21. On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong.  In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated.  Gree USA's CEO said that it was known that these two defects could cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact catching fire.  Gree USA's CEO also said that the Gree Companies had sold millions of

8

these defective dehumidifiers.  Gree USA's CEO further related that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall could cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share.  But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government.  Gree USA's CEO concluded his email by saying that this was a very important and urgent matter.  Neither Gree Zhuhai's board chairperson nor anyone else at Gree Zhuhai replied to this email.

22. Despite the Gree USA's CEO's September 4, 10, 21, and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012.

23. In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019.  The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated.  The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards.  Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

<u>The Gree Companies Continue to Sell</u>

<u>Their Defective Dehumidifiers in the United States</u>

<u>Without Reporting Them to the CPSC</u>

24. On October 19, 2012, a sales representative for Gree USA met in person with Gree Zhuhai's board chairperson in China. During this meeting, the sales representative discussed the defective Gree dehumidifiers with Gree Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she would send a new Gree Hong Kong manager ("Gree Hong Kong Manager #2") to the United States to address the problems associated with the dehumidifiers.

25. In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of fires related to the Gree dehumidifiers. These reports contradicted Gree Hong Kong Manager #1's statements at the September 19 meeting that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent dehumidifiers from overheating and catching fire and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. Despite these new consumer reports of fires caused by Gree dehumidifiers, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects or risks in October 2012.

26. In October 2012, Gree USA sold at least 2,938 defective Gree dehumidifiers to retailers in the United States for approximately $429,426. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations

that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

### The Gree Companies Receive Another Test Report Showing
### That Their Dehumidifiers are Defective and Dangerous

27. In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing company for testing.  On November 5, 2012, the testing company wrote a report confirming and reiterating that the Gree dehumidifiers were defective because the compressors in the dehumidifiers could run continuously and thereby overheat to an "extreme high temperature."  Gree USA's CEO received this report on November 6, 2012.  Gree USA's CEO immediately sent the report to Gree Hong Kong Manager #2, who had taken over responsibility for the importation and sale of the Gree dehumidifiers in the United States from Gree Hong Kong Manager #1.

### The Gree Companies Continue to Sell
### Their Defective Dehumidifiers in the United States
### Without Reporting Them to the CPSC

28. At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an attorney advised him to inform the CPSC immediately of all consumer reports of fires related to the Gree dehumidifiers.  Despite this legal advice and the November 5, 2012 test report reiterating that the Gree dehumidifiers were dangerously defective, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in November 2012.

29. In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in the United States for approximately $792,067.  The Gree Companies knew that the retailers

11

wanted dehumidifiers that met all UL standards and did not burn when overheated.  The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

> The Gree Companies Have Yet Another Meeting to Discuss
> Their Defective Dehumidifiers But Still Do Not Inform the CPSC

30. On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai.  At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO.  Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing.

31. No employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in December 2012.

32. In December 2012, Gree USA sold at least 1,395 defective Gree dehumidifiers to retailers in the United States for approximately $201,835.  The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated.  The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations

that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

### The Gree Companies Decide to Keep Selling
### Their Defective Dehumidifiers in the United States
### Without Reporting Them to the CPSC

33. On January 23, 2013, a Gree USA officer sent an email to Gree Hong Kong Manager #2.  The email stated that Gree USA's and MJC America's insurance company suggested that Gree USA report the Gree dehumidifiers to the CPSC and recall all of the defective Gree dehumidifiers.  The email also stated that the insurance company "wanted to know if any actions were taken to test the product design in case it is defective" and was told that "the product was submitted to several different testing and no faulty [sic] in the design was found[,] also that new production has an extra protection[.]"  The Gree USA officer further reported in her email that Gree USA had received a new consumer report of a dehumidifier fire and asked how Gree USA should handle this report.

34. Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested its dehumidifiers and that they were not defective and could be sold in the United States.  Gree Zhuhai did not provide Gree USA with any details on its testing or explain the inconsistency in its test results with those of all prior tests of the Gree dehumidifiers.

35. Despite the recommendation of Gree USA's insurance company to report the Gree dehumidifiers to the CPSC and recall the defective Gree dehumidifiers, and the new consumer report of fire, no employee of the Gree Companies informed the CPSC about the

dehumidifiers' defects, risks, or reported fires in January or February 2013.

36. Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively.  The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated.  The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards.  Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

<u>The Gree Companies Finally Report Their Defective Dehumidifiers</u>
<u>to the CPSC but Continue to Sell Those Dehumidifiers</u>
<u>in the United States</u>

37. On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers.  The initial report stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to these dehumidifiers.  The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn.

38. Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively.  The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when

overheated.  The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold.

39. On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance.

40. On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers.  This report stated that Gree USA, Gree Zhuhai, and MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that the dehumidifiers needed to be recalled.  This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013.

41. After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers.

42. The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012 through April 2013.  Additionally, the Gree Companies received at least $29,500,000 from the distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013.

43. United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013.

44. From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers.

### The Gree Companies Imported Their Defective Dehumidifiers
### With False UL Certifications

45. Between 2010 and at least until September 2012, the Gree Companies imported into the United States Gree dehumidifiers with certifications that the dehumidifiers met all UL standards, when in fact the dehumidifiers did not meet UL standards.

### The Gree Companies Finally Recall
### Their Defective Dehumidifiers

46. By mid-July 2013, Gree Zhuhai decided to recall its defective Gree dehumidifiers and notified the CPSC of this decision. After making this decision, Gree Zhuhai started to plan for the recall.

47. On September 12, 2013, Gree Zhuhai and the CPSC announced a voluntary recall of 2.2 million Gree dehumidifiers in the United States.

48. Despite its recall, Gree Zhuhai has received hundreds of consumer reports of fires and overheating caused by defective Gree dehumidifiers.  Consumers have reported more than 2,000 incidents involving Gree dehumidifiers, including 450 fires and more than $19,000,000 in property damage.

49. No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death.  After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers.

50. As a result of the Gree Companies' failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission, the Gree Companies were able to continue to distribute and wholesale their dehumidifiers, including defective Gree dehumidifiers, from September 2012 through April 2013, and received more than $39,000,000 in proceeds from this distribution and wholesale of Gree dehumidifiers.  For purposes of forfeiture, the approximately $39,000,000 that the Gree Companies received are assets associated with their failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission in violation of 15 U.S.C. §§ 2068(a)(4) and 2070.

**Exhibit D**

**Enhanced Compliance Measures**

**I.   Compliance Program**

So as to address and further reduce the risk of any recurrence of the misconduct at issue in this matter, Defendants Gree Electric Appliances, Inc. of Zhuhai ("Gree Zhuhai"), Hong Kong Gree Electric Appliances Sales Co., Ltd. ("Gree Hong Kong"), and Gree USA, Inc. ("Gree USA") (collectively the "Gree Companies") hereby agree as part of Gree USA's Plea Agreement and Gree Zhuhai's and Gree Hong Kong's Deferred Prosecution Agreement with the United States Department of Justice's Consumer Protection Branch and the United States Attorney's Office for the Central District of California ("the government") to adopt and maintain, or modify as necessary, compliance programs, including internal controls, compliance policies, and procedures (collectively the "Compliance Program") to ensure product safety and compliance with the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.* ("CPSA"), and regulations and agreements enforced by the United States Consumer Product Safety Commission ("CPSC") with respect to any consumer product manufactured, imported, distributed, or sold by the Gree Companies in the United States.  The Compliance Program, at a minimum, shall contain the following elements:

Written Standards, Policies and Procedures

1.   The Gree Companies shall establish and maintain, or modify as necessary, written standards, policies, and procedures with sufficient resources for responding to, investigating, and documenting allegations of potential product hazards, and violations of the CPSA, its implementing regulations, and agreements with the

1

CPSC, and which provides for the appropriate forwarding to personnel at the Gree Companies with authority to act ("Compliance Officer") of all information that may relate to, or affect, product safety and CPSA compliance, including all reports and complaints involving consumer products, whether an injury is referenced or not, and that may relate to, or affect, UL certification or listing, whether confirmatory testing has been conducted or not.

2.    The Gree Companies shall implement, maintain, and enforce an effective system of internal controls and procedures, to the extent that they do not yet exist, designed to ensure that, with respect to all consumer products manufactured, imported, or distributed by the Gree Companies and sold in the United States:

a.    information required to be disclosed by the Gree Companies to the CPSC is recorded, processed, and reported in accordance with applicable law;

b.    all required reporting made to the CPSC is timely, truthful, complete, accurate, and in accordance with applicable law; and

c.    prompt disclosure is made to the Gree Companies' relevant senior management of any deficiencies in the design or operation of such internal controls and procedures that are reasonably likely to adversely affect, in any material respect, the Gree Companies' ability to record, process, and report to the CPSC in accordance with applicable law.

<u>Confidential Employee Reporting</u>

3.    The Gree Companies shall establish or modify as necessary a confidential reporting program for their employees and agents who wish to disclose any concerns related to consumer product safety or

2

quality to a Compliance Officer or another senior manager with authority to act as necessary.

4.      The Gree Companies shall publicize the existence of the confidential reporting program annually to their employees and agents through emails, posting on Company intranets, live or online training, or other effective means.  The confidential reporting program shall include a non-retribution, non-retaliation policy, and shall facilitate anonymous and confidential communications for which appropriate confidentiality shall be maintained.

5.      Upon receipt of a disclosure related to consumer product safety or quality, a Compliance Officer or a senior manager with authority to act as necessary shall make a diligent, good-faith inquiry into the disclosure to ensure that he or she has obtained all the information necessary to determine whether a further review should be conducted.  The Compliance Officer or senior manager shall conduct such further review of for any disclosure that is sufficiently specific to:

a.      permit determination of the appropriateness of the alleged impropriety; and

b.      provide an opportunity for taking corrective action.

6.      The Compliance Officer or senior manager shall maintain a disclosure log, which shall include a record and an accurate and complete summary of each disclosure related to consumer product safety or quality received (whether anonymous or not), the status of the respective reviews, and any corrective action taken in response to the reviews.  All information gathered by the confidential reporting program shall be maintained for at least five (5) years following closure of the review and corrective action.

### Training and Enforcement

7.     The Gree Companies shall implement and maintain, or modify as necessary, mechanisms designed to ensure that the Compliance Program is effectively communicated to all applicable directors, officers, employees, and where necessary and appropriate, agents, vendors, and business partners.

8.     The Gree Companies shall establish and maintain, or modify as necessary, an effective system for providing guidance, training and advice to directors, officers, employees, and where necessary and appropriate, agents, vendors, and business partners, on complying with the CPSA, its implementing regulations, agreements with the CPSC, and the Compliance Program, including when they need advice on an urgent basis.

### Management Responsibility and Accountability

9.     The Gree Companies shall assign continuing responsibility for the implementation and oversight of the Compliance Program to one or more senior corporate executives who, by reason of background, experience, education, or training are competent to oversee product safety and regulatory compliance-related matters. Such corporate executive(s) shall have the authority to report directly to independent monitoring bodies, including internal auditors, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Record Retention and Provision

10.     The Gree Companies shall ensure retention of all CPSA compliance-related records for at least five (5) years and shall

make such records available to the government or CPSC staff upon reasonable request, subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine.  However, the Gree Companies must provide to the government a log of any document or information that is not provided based on an assertion of law, regulation, or privilege, and the Gree Companies bear the burden of establishing the validity of any such assertions.

11.  Upon reasonable request of the government or CPSC staff, the Gree Companies shall provide written documentation of their compliance-related improvements, processes, and controls, including, but not limited to, the effective dates of such improvements, processes, and controls.  Upon reasonable request, the Gree Companies shall cooperate fully and truthfully with the government and CPSC staff to make available, in a manner agreed to by the parties, all non-privileged information and materials, and personnel deemed necessary by the government or CPSC staff, to identify and evaluate records related to the Gree Companies' compliance with the CPSA, its implementing regulations, agreements with the CPSC, and the Compliance Program.  The Gree Companies' cooperation pursuant to this paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine.  However, the Gree Companies must provide to the government a log of any document or information that is not provided based on an assertion of law, regulation, or privilege, and the Gree Companies bear the burden of establishing the validity of any such assertions.

<u>Compliance Expert</u>

12.   The Gree Companies shall retain, at the Gree Companies' expense, an independent person or persons (the "Expert"), without personal or financial ties (other than the retention agreement between the parties) to the Gree Companies and/or the families of their senior management, who by reason of background, experience, education, and training, is qualified to advise the Gree Companies on product safety and regulatory compliance issues under the CPSA and its implementing regulations.  The Expert's qualifications shall include, but not be limited to, creating comprehensive product safety and regulatory compliance policies, designing employee training programs, and conducting regulatory compliance audits and inspections.  The Gree Companies shall notify the government in writing of the name(s) and qualifications of the Expert as soon as they retain the Expert.

13.   Within six months of the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong, the Expert shall, in consultation with the Gree Companies, start the process of auditing and advising the Gree Companies on the following aspects of their Compliance Program:

a.   written standards, policies and procedures that provide for the appropriate forwarding to compliance personnel of all information that may relate to, or impact, CPSA compliance, including all reports and complaints involving consumer products manufactured, imported, or distributed by the Gree Companies and sold in the United States, whether an injury is referenced or not;

b.   a mechanism for confidential employee reporting of compliance-related questions or concerns to either a compliance

officer or to another senior manager with authority to act as necessary;

c.   effective communication of compliance-related policies and procedures regarding the CPSA to all applicable employees through training programs or otherwise;

d.   senior management responsibility for CPSA compliance and accountability for violations of the CPSA and its implementing regulations; and

e.   retention of all CPSA compliance-related records for at least five (5) years, and availability of such records to the government or CPSC staff upon reasonable request.

14.   The Expert shall report to the government periodically, at no less than twelve-month intervals during a three-year term (the "Term"), regarding the Gree Companies' remediation and implementation of their Compliance Program and these Enhanced Compliance Measures.  The Term shall begin on the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong.  During the Term, the Expert shall submit an initial report and at least two (2) follow-up reports (collectively the "Expert Reports").

a.   By no later than twelve (12) months from the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong, the Expert shall submit to the government a written report (the "initial Expert Report") setting forth a description of the Gree Companies' remediation efforts to date, and when necessary and appropriate, their proposals reasonably designed to improve their Compliance Program for ensuring consumer product safety and compliance with the CPSA.  The initial Expert Report

shall include an evaluation of the aspects of the Gree Companies' Compliance Program set forth in Paragraph 13 above.

b. The Expert shall submit to the government at least two (2) follow-up written reports (the "follow-up Expert Reports"). The first follow-up Expert Report shall be completed and delivered to the government no later than twelve (12) months after the initial Expert Report is submitted to the government. The second follow-up Export Report shall be completed and delivered to the government no later than thirty (30) days before the end of the Term or twelve (12) months after the first follow-up Expert Report, whichever is earlier. The follow-up Expert Reports shall assess whether the Gree Companies' Compliance Program is reasonably designed to ensure consumer product safety and compliance with the CPSA, and include an evaluation of the aspects of the Gree Companies' Compliance Program set forth in Paragraph 13 above.

c. The Expert Reports likely will include proprietary, financial, confidential, and competitive business information. Public disclosure of the Expert Reports could discourage cooperation or impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the Expert Reports and contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the Gree Companies and the government in writing, or except to the extent that the government determines in its sole discretion that disclosure would be in furtherance of the government's discharge of its duties and responsibilities or is otherwise required by law.

d.    The Expert or the Gree Companies may submit a timely written request for an extension of time to provide any of the Expert Reports.  A written request is timely if received by the government at least five (5) days before the date the report is due. Timely requests for extension will not be unreasonably denied.

## II.  Gree Reporting Requirements

15.  The Gree Companies shall report to the government periodically, at no less than twelve-month intervals during the three-year Term, regarding their remediation and implementation of the Compliance Program and these Enhanced Compliance Measures.  As with the Expert Reports, the Term shall begin on the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong.  During the Term, the Gree Companies shall:

a.    Conduct an initial review and submit an initial report; and

b.    Conduct and prepare at least two (2) follow-up reviews and reports, as described below.

16.  By no later than twelve (12) months from the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong, the Gree Companies shall submit to the government a written report (the "initial Gree Report") setting forth a complete description of their remediation efforts to date, and when necessary and appropriate, their proposals reasonably designed to improve the Gree Companies' Compliance Program for ensuring consumer product safety and compliance with the CPSA, and the proposed scope of the subsequent reviews.

17.  The Gree Companies shall undertake at least two (2) follow-up reviews and reports (the "follow-up Gree Reports"),

9

incorporating the government's views on the Gree Companies' previous reviews and reports, to further monitor and assess whether the Gree Companies' Compliance Program is reasonably designed to ensure consumer product safety and detect and prevent violations of the CPSA.

18.   The first follow-up Gree Report shall be completed and delivered to the government no later than twelve (12) months after the initial Gree Report is submitted to the government.   The second follow-up Gree Report shall be completed and delivered to the government no later than thirty (30) days before the end of the Term or twelve (12) months after the first follow-up Gree Report, whichever is earlier.

19.   The initial and follow-up Gree Reports may rely on, reference, or incorporate, in whole or in part, the Expert Reports.

20.   The Gree Reports likely will include proprietary, financial, confidential, and competitive business information. Public disclosure of the Gree Reports could discourage cooperation or impede pending or potential government investigations and thus undermine the objectives of the reporting requirement.   For these reasons, among others, the Gree Reports and contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the Gree Companies and the government in writing, or except to the extent that the government determines in its sole discretion that disclosure would be in furtherance of the government's discharge of its duties and responsibilities or is otherwise required by law.

21.   The Gree Companies may submit a timely written request for an extension of time to provide any of the Gree Reports.   A written

10

request is timely if received by the government at least five (5) days before the date the report is due.  Timely requests for extension will not be unreasonably denied.

### III. Certifications and Resolutions

22.  In addition to the Gree Companies' reporting requirements set forth in Paragraphs 15-21, the Gree Companies shall make annual compliance-related certifications and resolutions to the government as described below:

a.  The Gree Companies shall conduct the reviews described in this paragraph and Paragraph 23 for each of three (3) Review Periods.  The duration of each Review Period shall be twelve (12) months, beginning with the first twelve (12) month period following the Effective Date of the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong.  The Gree Companies shall provide the certifications and resolutions described in this paragraph and Paragraph 23 to the government within one hundred twenty (120) days following the end of each of the Review Periods.

b.  Following the end of each Review Period, the President or Chief Executive Officer ("President") of Gree Zhuhai shall conduct a review of the Gree Companies' compliance with their obligations under the Compliance Program and these Enhanced Compliance Measures.  Based on his or her review, the President shall submit to the government a certification stating that, to the best of his or her knowledge based on a reasonable inquiry, during the preceding Review Period, the Gree Companies complied with all its obligations under the Compliance Program and these Enhanced Compliance Measures.  The certification shall summarize the review described above.  If the President is unable to provide any part of

11

this certification as specified herein, he or she shall provide a detailed explanation of why he or she is unable to provide such certification.  The certification and detailed explanation shall be sworn to under the pains and penalty of perjury in the United States (and, if applicable, under the pains and penalty of perjury in the jurisdiction where the President makes the certification or detailed explanation ("Other Jurisdiction")) and shall set forth that the representations contained therein may be provided to, relied upon, and material to the United States (and, if applicable, the Other Jurisdiction), and that a knowing false statement could result in criminal or civil liability for the signatory in the United States (and, if applicable, the Other Jurisdiction).

23.  Following the end of each Review Period, the Board of Directors of Gree Zhuhai or a designated Committee thereof (the "Board"), shall conduct a review of the Gree Companies' compliance with their obligations under the Compliance Program and these Enhanced Compliance Measures.  The Board shall evaluate the Gree Companies' compliance by, at a minimum, receiving updates about the activities of management employees responsible for ensuring compliance with the Compliance Program and these Enhanced Compliance Measures, and updates about the adoption and implementation of policies, procedures, and practices as it relates to such compliance.  Based on its review, the Board shall submit to the government a resolution that summarizes its review and oversight as set forth above and that includes, at a minimum, the following language:

> The Board of Directors of Gree Zhuhai (or a designated
> Committee of the Board) has made a reasonable inquiry

as described in Paragraph 23 of the Enhanced Compliance Measures Exhibit D to the Plea Agreement with Gree USA and the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong concerning the Gree Companies' compliance with their obligations under the Compliance Program and the Enhanced Compliance Measures in Exhibit D for the preceding Review Period, [insert date range], including the performance of management employees responsible for ensuring such compliance. Based on its reasonable inquiry and review, the Board has concluded that, to the best of its knowledge, the Gree Companies have complied with all their obligations under the Compliance Program and the Enhanced Compliance Measures in Exhibit D to the Plea Agreement with Gree USA and the Deferred Prosecution Agreement with Gree Zhuhai and Gree Hong Kong.

If the Board is unable to provide any part of this statement, it shall include in the resolution a written explanation of the reasons why it is unable to provide such a statement.

24.   The Gree Companies may submit a timely written request for an extension of time to provide the annual President certification or Board resolution required in Paragraphs 22 and 23.  A written request is timely if received by the government at least five (5) days prior to the date by which the certification or resolution is due.  Timely requests for extension will not be unreasonably denied.

25.  All certifications, resolutions, reports, notifications and other materials and information that must be provided to the government as a part of these Enhanced Compliance Measures shall be delivered by: (1) email to an email address provided by the government; and (2) personal delivery, or overnight delivery by a recognized delivery service addressed to the following:

Director, Consumer Protection Branch
U.S. Department of Justice
450 5th Street, NW, Suite 6400 South
Washington, DC 20001

13

and

Chief, Environmental and Community Safety Crimes Section
U.S. Attorney's Office
Central District of California
1300 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012

## CERTIFICATE OF SERVICE

I, **Catherine Wilkinson**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**Plea Agreement**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☒ Via email, as follows:

☐ By Federal Express, as follows:

**Email: jkoukios@mofo.com**

**scash@mofo.com**

This Certificate is executed on **October 28, 2021**, at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct.

*Catherine Wilkinson*
Catherine Wilkinson
Legal Assistant